# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**vs.**                                 **CR. No. 10-332 JP**

**MIGUEL ANGEL DIAZ-GOMEZ,**
**OMERO MENDES-ESCARENO,**
**and OSCAR ARMANDO QUIROGA-GOMEZ,**

     **Defendants.**

## MEMORANDUM OPINION AND ORDER

Defendants Miguel Angel Diaz-Gomez (Diaz-Gomez), Omero Mendes-Escareno (Mendes-Escareno), and Oscar Armando Quiroga-Gomez (Quiroga-Gomez) have been indicted for possession with intent to distribute 500 grams of more of methamphetamine in violation of 18 U.S.C. §§ 841(a)(1), (b)(1)(a);  for  conspiracy in violation of 18 U.S.C. § 846; and for aiding and abetting in violation of 18 U.S.C. § 2. *See* Indictment, Doc. No. 20.

On April 30, 2010, Diaz-Gomez, through his attorney John F. Robbenhaar, filed Miguel Diaz-Gomez's Motion To Suppress (Doc. No. 30) (the "Motion").  On May 11, 2010, the United States, through Assistant United States Attorney John C. Anderson, filed United States' Response To Defendant Miguel Diaz-Gomez' Motion To Suppress (Doc. No. 34) (the "Response"). On May 20, 2010, Diaz-Gomez filed Defendant Miguel Diaz-Gomez' Reply To United States' Response To His Motion To Suppress (Doc. No. 37).  On June 16, 2010, the Court held a hearing on the Motion at which Diaz-Gomez was present and was represented by Mr. Robbenhaar.  Quiroga-Gomez joined in the Motion and participated in the hearing in person and through his attorney Edward O. Bustamante. *See* Unopposed Notice of Joinder In June 16,

2010 Motion Hearing (Doc. No. 38).  At the hearing, the Court asked for supplemental briefing from both Diaz-Gomez and Quiroga-Gomez.  On July 1, 2010, Diaz-Gomez filed Defendant Miguel Diaz-Gomez' Supplemental Brief In Support Of Motion To Suppress (Doc.  No. 44).  On July 8, 2010, Quiroga-Gomez filed his Supplemental Brief In Support of Suppression Motion (Doc. No. 48). On July 19, 2010, the United States filed United States' Response To Defendants' Motion To Suppress (Doc. No. 53) addressing the arguments made in Diaz-Gomez's and Quiroga-Gomez's supplemental briefs. Diaz-Gomez then filed a Reply brief (Doc. No. 62).

In the Motion Diaz-Gomez and Quiroga-Gomez ask the Court to suppress the methamphetamine found during a search of the pick-up truck, which Diaz-Gomez was driving and in which Quiroga-Gomez was a passenger.

### Factual Background

On the morning of December 17, 2009, New Mexico State Police Officer Arcenio Chavez was patrolling in a marked K-9 SUV vehicle westbound on Interstate 40 west of Albuquerque, New Mexico. Officer Chavez testified that he noticed a white pickup truck traveling eastbound in the inside left lane. At the crest of a hill, Officer Chavez and the white pickup truck passed each other going opposite directions. Officer Chavez noticed on his radar unit that the truck was traveling at 75 mph, the posted speed limit.  Officer Chavez testified that he observed the truck traveling only two to three car lengths behind a "PT Cruiser type" vehicle. Tr. 5:8-16. Based on this observation, Officer Chavez believed that the truck had violated N. M. Stat. Ann. § 66-7-318(A), which prohibits a driver from following another vehicle too closely.[1]

---

[1] "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." N.M. Stat. Ann. § 66-7-318(A) (1978).

Officer Chavez turned around in the median and drove eastbound at approximately 110 to 115 miles per hour to catch up to the truck. The video equipment located on the front bumper of his vehicle began recording as Officer Chavez approached the truck.[2]  Officer Chavez's patrol vehicle also contained another video camera positioned near the passenger side window, which recorded the stop from a slightly different angle.  Copies of both video recordings were admitted into the record, and the Court has viewed both recordings.[3]

As Officer Chavez caught up to the truck, he noticed that the truck was still traveling behind the "PT Cruiser type" vehicle and that both vehicles had moved over to the right lane. For about 14 seconds, Officer Chavez drove in the left lane behind and beside the truck. At 9:43 a.m., Officer Chavez pulled into the right lane behind the truck and engaged his emergency lights. The truck immediately pulled over to the shoulder of Interstate 40. Officer Chavez approached the passenger's side of the truck and saw three occupants: Diaz-Gomez, the driver, Mendes-Escareno, the front seat passenger, and Quiroga-Gomez, the back seat passenger. Through the open passenger's window, Officer Chavez asked Diaz-Gomez for his driver's license, registration and insurance and informed Diaz-Gomez that he was following too closely to "that PT Cruiser."  Diaz-Gomez stated that he did not have a driver's license, but that he had a Mexican identification card.  Mendes-Escareno, the front-seat passenger, told Officer Chavez that he was the owner of the truck, and he gave Officer Chavez his Arizona driver's license, and the truck's registration and proof of insurance documents.

_____

[2] Officer Chavez testified that the video recording equipment in the grill of his vehicle began to record the stop from approximately one minute before Officer Chavez engaged his emergency lights. Tr. 6:6-12 (June 16, 2010).

[3] The Court will refer to the grill video recording as Video 1, and the Court will refer to the side video recording as Video 2.

At 9:44:50 a.m., after obtaining the documents, Officer Chavez asked Diaz-Gomez to step out of the truck and accompany him to the front bumper area of his patrol unit, which was Officer Chavez's usual practice.  Officer Chavez then told Diaz-Gomez that he would receive a citation for following too closely behind another vehicle and a warning citation for failing to have a driver's license.

While writing the citations, Officer Chavez questioned Diaz-Gomez about his travel plans. Diaz-Gomez informed Officer Chavez that the three men were traveling to see his aunt at a place near Canada, but Diaz-Gomez then specified that their destination was Minneapolis, where they planned to visit his aunt for the holidays. Diaz-Gomez identified the passengers as his friend and his brother-in-law.  During this conversation, Diaz-Gomez leaned against the patrol vehicle's hood resting on his forearms.  Officer Chavez testified that this posture appeared suspicious to him:

> Well , I've stopped a lot of people, and most innocent people wouldn't lean on a patrol unit. I think he's just trying to calm his nervous behavior and it is not very consistent with innocent motoring traveling. Most people will just stand there and not bother to lean over a patrol unit.

Tr. 34:5-9.

At 9:56:00 a.m., Officer Chavez returned Diaz-Gomez's identification card and instructed Diaz-Gomez to stay at the front of the patrol vehicle. Officer Chavez then walked to the truck with the citations in hand.  Officer Chavez told Mendes-Escareno that he was going to check the VIN on the dash and on the door; and after that, the group would be allowed to be on their way.  Officer Chavez walked to the driver's side of the truck and checked the dashboard VIN plate, which was visible through the front windshield.  Officer Chavez then opened the driver's side door and checked the VIN on the driver's door panel.  Through the open driver's

4

door, Officer Chavez leaned partway into the truck and asked Mendes-Escareno if the truck was his vehicle and how long he had owned it.  Officer Chavez also asked Mendes-Escareno about travel plans. Tr. 9:1-4. Mendes-Escareno confirmed that they were traveling to Minneapolis to visit Diaz-Gomez's family, but he did not know the name of the family member they intended to visit. Tr. 45:23-24; 77:14-19.

At 9:59:30 a.m., Officer Chavez returned to his patrol unit where Diaz-Gomez was waiting. Officer Chavez gave the citations to Diaz-Gomez and told Diaz-Gomez that he was "good to go." At that point, 17 minutes after he was pulled over, Diaz-Gomez started walking back to the truck.  Video 1 shows that when Diaz-Gomez began to walk back to the truck, Mendes-Escareno, the truck's owner and a licensed driver, opened his door and stood up, presumably in preparation to drive.

Just before Diaz-Gomez reached the truck, Officer Chavez called out to him and asked if it would "be okay to ask [him] some questions."  Diaz-Gomez turned around and walked back toward the patrol vehicle. Officer Chavez asked again if it would be okay to ask him some more questions. Diaz-Gomez answered yes.

In response to additional questions about their travel plans, Diaz-Gomez reiterated their plans to travel to Minneapolis to see his aunt.  Officer Chavez asked Diaz-Gomez for his aunt's phone number, and Diaz-Gomez provided a phone number.  Officer Chavez asked Diaz-Gomez for his passenger's name and how long he had known him. Diaz-Gomez told Officer Chavez that he and Mendes-Escareno had gone to "Bulldog High School" together.  Officer Chavez next asked Diaz-Gomez similar questions about the back seat passenger.  Diaz-Gomez told Officer Chavez that Quiroga-Gomez was his brother-in-law.

At 10:02:45 a.m., Officer Chavez returned to the truck, handed Mendes Escareno his

license, registration and insurance documents, and told the two passengers in English that they were "good to go."  Officer Chavez then asked whether he could ask them a few questions. Officer Chavez testified that both Mendes-Escareno and Quiroga-Gomez agreed. Tr. 9:17-22. Officer Chavez asked Mendes-Escareno to step out of the truck, and Officer Chavez questioned him on the shoulder of the highway about 10 feet from the truck. Officer Chavez asked Mendes-Escareno where they were going, and Mendes-Escareno stated that they were going to Minneapolis for about two weeks to visit Diaz-Gomez's family, but that he did not know the names of the family members they intended to visit.  Officer Chavez asked Mendes-Escareno if the truck was his, and Mendes-Escareno stated that he was buying it.  Officer Chavez asked him how he knew Diaz-Gomez, and Mendes-Escareno answered that he knew Diaz-Gomez from high school and that the high school mascot was a bulldog.

At 10:05:02 a.m., Officer Chavez returned to the open passenger door and spoke to Quiroga-Gomez who was still sitting in the back seat. Officer Chavez asked him in English where they were going, and Quiroga-Gomez answered "Minneapolis" in English.  Officer Chavez asked subsequent questions in Spanish after Quiroga-Gomez indicated that he spoke primarily Spanish. Officer Chavez testified that he was able to speak some Spanish but that he was not fluent in Spanish. Tr. 52:22-53:13.  Quiroga-Gomez told Officer Chavez in Spanish that they were traveling to see Diaz-Gomez's family, but he did not know the names of the family members or how long the three men were going to stay in Minneapolis. Tr. 45:25-46:2; 79:9. Officer Chavez testified that he considered both Mendes-Escareno's and Quiroga-Gomez's answers suspicious because normally people who travel long distances know exactly where they are going, who they are going to visit, and for how long. Tr. 44:19-25; 77:23-78:2. Officer Chavez testified that based on his training and experience, these types of vague answers were

6

inconsistent with innocent travel. Tr. 44:16-25; 80:8-12.

At 10:06:26 a.m., Officer Chavez approached Mendes-Escareno and told him that he could "have a seat," and Mendes-Escareno sat back down in the passenger's seat. Officer Chavez returned to Diaz-Gomez in front of the patrol vehicle and stated that Quiroga-Gomez had told him that he was Diaz-Gomez's brother-in-law.  Diaz-Gomez clarified that he was dating Quiroga-Gomez's sister.

At 10:07:00 a.m., Officer Chavez asked Diaz-Gomez if there were any weapons, explosives, narcotics or large amounts of cash in the truck.  Diaz-Gomez answered "no" to each question.  Officer Chavez testified that Diaz-Gomez broke eye contact when asked about methamphetamine in the truck. Tr. 54:10-14.  Officer Chavez asked Diaz-Gomez if he was responsible for everything in the vehicle. Diaz-Gomez answered that he was responsible for himself and his bag and asked Officer Chavez if Officer Chavez wanted to search his bag.

At 10:07:29 a.m., Officer Chavez asked Diaz-Gomez if he could search the truck, and Diaz-Gomez said "no."  Apparently ignoring the answer or not having heard it clearly, Officer Chavez then said "Yeah? Okay. Hold on. Hold on. I have a form here. Do you read English or Spanish better?" Diaz-Gomez replied "either." Officer Chavez told Diaz-Gomez that he was confused about his trip, and Diaz-Gomez offered to show Officer Chavez their map. Officer Chavez, under the impression that Diaz-Gomez had made a call on his cell phone, told him to "hang it up." After hanging up his cell phone, Diaz-Gomez stated that it was his mom on the phone and that when they were pulled over, his mom became worried and had told Diaz-Gomez to call her back. Undeterred, Officer Chavez reiterated that he just wanted to search the truck and asked Diaz-Gomez if that would be okay. Diaz-Gomez did not reply verbally. Officer Chavez handed Diaz-Gomez the consent to search form and explained that it allowed him to search the

vehicle.  Officer Chavez told Diaz-Gomez to be sure and read the form and understand it before

he signed it.

At 10:09:10 a.m., Diaz-Gomez proceeded to read the form out loud in English. At

10:10:06, Officer Chavez stated to Diaz-Gomez that the form allowed the officer to "search the

vehicle," and that Diaz-Gomez did not have to sign the form.  After Officer Chavez asked Diaz-

Gomez if he read the form in both English and Spanish, Diaz-Gomez then proceeded to read the

form out loud in Spanish. After Diaz-Gomez signed the form, Officer Chavez asked Diaz-

Gomez if he could check him for weapons, and Diaz-Gomez allowed the officer to pat him

down. Officer Chavez asked Diaz-Gomez to wait by the fence located about 10 to 20 feet

beyond the shoulder of the highway. When his cell phone made a chirping sound, Diaz-Gomez

told Officer Chavez that he was receiving a call from his father, but Officer Chavez informed

Diaz-Gomez that he was going to put Diaz-Gomez's phone into the truck.[4]

At 10:12:23 a.m., Officer Chavez returned to the truck, put Diaz-Gomez's phone into the

truck, and asked Mendes-Escareno to step out of the truck. Tr. 83:16-18. Officer Chavez began

to fill out the consent form for Mendes-Escareno to sign. Officer Chavez asked Mendes-

Escareno whether there were any weapons, explosives or other contraband, specifically drugs or

large amounts of cash in the truck. Officer Chavez testified that Mendes-Escareno denied having

any of the items, but he broke eye contact when asked specifically about methamphetamine. Tr.

54:15-19. Officer Chavez asked for and received oral permission from Mendes-Escareno, the

owner of the truck, to search the truck. Tr. 9:23-25.  Officer Chavez provided Mendes-Escareno

with the consent form and told Mendes-Escareno to make sure that he understood the form

---

[4] Actually, Diaz-Gomez was receiving a call on the cell phone's "push to talk" feature.
This feature allows a person to converse with another immediately.

before he signed it.  Mendes-Escareno signed the form. *Id.*

At 10:14:40 a.m., Officer Chavez asked Mendes-Escareno if he had any weapons and told him that he was going to check him for weapons. Mendes-Escareno complied. As he patted down Mendes-Escareno, Officer Chavez felt a hard object in Mendes-Escareno's front pants' pocket.  Officer Chavez asked Mendes-Escareno to empty his pockets, and Mendes-Escareno pulled out a baggie from his front pocket.  The baggie contained a hard glass-like substance that Officer Chavez's training had taught him looked like methamphetamine. The substance field-tested positive for methamphetamine. Officer Chavez immediately arrested Mendes-Escareno and put him in the back seat of his patrol vehicle. Tr. 10:5-15.

At 10:16:51 a.m., a backup officer arrived.  At 10:18:02 a.m., Officer Chavez returned to the truck and asked Quiroga-Gomez to step out of the truck.  Quiroga-Gomez opened the back door on the passenger's side and stepped onto the shoulder of the highway. Officer Chavez asked Quiroga-Gomez in Spanish whether the truck contained contraband, which Quiroga-Gomez denied.  Officer Chavez testified that like the others, Quiroga-Gomez broke eye contact when asked about methamphetamine. Tr. 55-1-7. Officer Chavez asked Quiroga-Gomez for permission to search the truck, and Officer Chavez began filling out the Spanish portion of the consent form already signed by Diaz-Gomez and Mendes-Escareno.  Quiroga-Gomez read the form and  asked Officer Chavez whether he was required to consent, and Officer Chavez told him that he was not required to consent. Quiroga-Gomez then said in Spanish that he did not want him to search the truck, and Quiroga-Gomez did not sign the form. Officer Chavez took back the unsigned form and briefly patted Quiroga-Gomez down for weapons.  Officer Chavez asked Quiroga-Gomez to stand by the fence about 10 to 20 feet beside the truck.  On the passenger side of the truck, both the front passenger door and the back crew-cab door remained

9

open.

At 10:25:42 a.m., Officer Chavez retrieved his canine "Chica," who is trained to detect illegal substances, and directed her on a leash around the exterior of the truck. When Chica approached the open front passenger door, she "alerted"[5] and jumped into the front passenger's side of the truck as Officer Chavez let go of the leash.  Officer Chavez testified that he did not prompt Chica to enter the truck, but that Chica alerted, pulled at the leash, and jumped into the truck on her own volition. Tr. 91:22-24; 92:13-22. Chica indicated inside the truck by directing her attention to the area under the dashboard on the passenger's side.[6] Tr. 92:24-25. Officer Chavez led Chica out of the truck and directed Chica around the truck's exterior on the driver's side.  At 10:28:25 a.m., Officer Chavez opened the driver's side door and the crew-cab door on the driver's side. Chica again jumped into the truck on the driver's side and focused her attention on the same location under the dashboard. Tr. 93:16-23.

At 10:30:17 a.m., Officer Chavez informed Quiroga-Gomez that he was being detained because methamphetamine was found in Mendes-Escareno's possession. Officer Chavez also informed Quiroga-Gomez that he was going to get a warrant to search the truck. The backup officer handcuffed Quiroga-Gomez, and Officer Chavez told him that he was going to be transported to the State Police office. While Officer Chavez handcuffed Diaz-Gomez, Officer Chavez informed him that he was not under arrest, but that Diaz-Gomez was being detained. Officer Chavez also informed Diaz-Gomez that he was going to get a search warrant for the

---

[5] Officer Chavez testified that Chica alerts by changing her body posture, increasing her respiration and pulling her handler to the area. Tr. 91:25-92:2.

[6] Officer Chavez testified that Chica indicates the presence of contraband in a specific area by biting or  scratching an area. Tr. 92:1-25.

truck. Officer Chavez called a tow truck to transport the pickup truck to the State Police office in Albuquerque. Tr. 95:4-6.

At approximately 3:30 p.m., Officer Chavez obtained a warrant to search the truck signed by Bernalillo County District Judge Charles W. Brown. Tr. 90:1-12. During the search, two black packages were discovered in a compartment behind the glove box on the passenger's side of the truck. Tr. 11:10-15. Those packages, weighing approximately two pounds, tested positive for methamphetamine. *Id.*

*Discussion*

I. *Diaz-Gomez's and Quiroga-Gomez's Standing To Challenge the Search of the Truck*

When a defendant is not the owner of the vehicle he is driving, he must show that he had "a legitimate possessory interest in or [a] lawful control over the car" before he may challenge a search of the vehicle. *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003) (citation omitted). There is no dispute that Diaz-Gomez was driving the truck with permission from the owner, Mendes-Escareno; therefore, Diaz-Gomez has standing to challenge the search of the truck. *Id.*

Quiroga-Gomez, the back seat passenger, does not have standing to directly challenge the search of the truck, but he does have standing to challenge the search if he can show that the evidence was the fruit of his unlawful detention. *See United States v. Sanchez*, 376 F. Supp. 2d 1264, 1271 (D.N.M. 2005) (holding that a passenger may seek suppression of evidence discovered in the vehicle in which he was riding as the fruit of an unlawful stop, detention, or arrest).

II. *The Traffic Stop*

Because a traffic stop is considered a type of seizure subject to the Fourth Amendment, the Court will analyze the traffic stop under the standards of *Terry v. Ohio*, 392 U.S. 1, 22-24 (1968). *United States v. Tibbetts*, 396 F.3d 1132, 1136 (10th Cir. 2005). Under *Terry*, a traffic stop must be justified at its inception and reasonably related in scope to the circumstances that justified the stop in the first place. *United States v. Gregory*, 79 F.3d 973, 977 (10th Cir. 1996) (citing, *Terry*, 392 U.S. at 20). A traffic stop is justified only if the officer has reasonable suspicion that the motorist violated a traffic law or regulation. *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir.2004). Even if the motorist did not in fact violate a traffic law, a stop is justified if the officer had an "objectively reasonable" good faith belief that a violation occurred. *Id.*; *see also United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir.2001) (upholding a traffic stop based on a reasonable articulable suspicion that a cracked windshield substantially obstructed the driver's view as required by statute, regardless of whether or not the crack actually constituted a violation of the law).

A. *Was The Stop Justified?*

Diaz-Gomez and Quiroga-Gomez argue that the stop was not justified because Officer Chavez lacked reasonable suspicion that Diaz-Gomez had violated N.M. Stat. Ann. § 66-7-318(A). The statute prohibits following another vehicle "more closely than is reasonable and prudent" in light of the traffic conditions, the speed of the vehicles and the condition of the highway. *Id.* Diaz-Gomez asserts that he was not following the other vehicle more closely than is reasonable and prudent  under the clear, dry weather conditions and the light traffic at the time. Diaz-Gomez correctly notes that the statute does not rigidly define how much space must be between vehicles at any given time; but instead, the statute allows a driver flexibility to judge

what should be a safe following distance.  Diaz-Gomez argues that the video reveals that he was not following at an unsafe distance. Diaz-Gomez asks the Court to apply the reasoning of *United States v. Valadez-Valadez* and find that the stop was not justified. 525 F.3d 987, 991 (10th Cir. 2008).

In *Valadez-Valadez* an officer stopped the defendant's vehicle for traveling 45 mph in a 55 mph zone, which the officer believed violated a statute prohibiting a driver from impeding the flow of traffic. *Id.* at 988. The court determined that the officer did not have reasonable suspicion that the defendant was violating the statute because there was no evidence that the defendant was actually impeding traffic. *Id.* at 992-93 (agreeing with most courts that "driving at a speed moderately below the speed limit does not, without more, constitute obstructing or impeding traffic.").

The United States argues that the stop was based on Officer Chavez's observation before he turned around and before the video recorder began recording. Officer Chavez credibly testified that when he was traveling westbound, he saw the pickup truck traveling eastbound at 75 mph and following only two to three car lengths behind a "PT Cruiser" type vehicle. Officer Chavez testified that he used the "three second rule" from the New Mexico Driver's Manual as a guide to what distance a "reasonable and prudent" driver should maintain between vehicles. Tr. 26:1-11.  The Manual instructs drivers that to avoid sudden rear end collisions, a driver should allow space for his vehicle to travel three seconds behind the vehicle in front of him. Resp. Ex. 1 at pp. 23-24 (explaining the "three second rule.").  The United States asserts that at 75 mph, a car travels 110 feet per second; therefore, a car traveling at 75 mph would travel 330 feet in three seconds.  According to the United States, a reasonable and prudent driver driving 75 mph should maintain a distance of about 330 feet behind the car in front of him under the three second rule.

Noting that the length of an average car is approximately 15 feet and that two to three car lengths would be about 30 to 45 feet, the United States asserts that to comply with the reasonable and prudent standard, Diaz-Gomez should have maintained several more "car lengths" between his vehicle and the vehicle in front of him.

The Court recognizes that the Manual's "three second rule" does not define a reasonable and prudent distance under the statute, but an officer charged with enforcing a reasonable and prudent standard may rely on traffic manuals and his training and experience as guides to determine whether the statutory standard has been violated. *See, e.g., United States v. White*, 584 F.3d 935, 946 (10th Cir. 2009) (applying the officer's "two-second test" learned from training and experience and finding that defendant violated a Kansas statute requiring a driver passing another vehicle to safely clear the vehicle before reentering the lane).

*United States v. Vercher* involved a traffic stop in which the officer stopped Vercher's vehicle after he observed the vehicle traveling 70 mph about two car lengths behind another vehicle. The evidence showed that this distance was "one-fourth to one-fifth of what was . . . generally considered safe." 358 F.3d at 1261. The district court, however, granted a motion to suppress finding the officer was not justified in stopping the vehicle for a violation of the Kansas statute identical to the New Mexico statute. The Tenth Circuit reversed concluding that "[the officer's] observation of the high speed and close distance . . . provide[d] a sufficient basis to suspect that [defendant] was following more closely than was reasonable and prudent under the circumstances." *Id.* at 1262.

In his supplemental brief (Doc. No. 44), Diaz-Gomez points out that Officer Chavez followed behind his truck for about 14 seconds before he turned on his emergency lights and pulled the truck over.  Diaz-Gomez reasons that if Officer Chavez had observed a violation

14

before he turned around, Officer Chavez would have immediately pulled him over instead of following him for 14 seconds. In addition, Diaz-Gomez argues that if the stop was based on the previous observation, Officer Chavez would have explained this to Diaz-Gomez. Instead, Video 1 reveals that after Diaz-Gomez told Officer Chavez that he pulled into the right lane behind the PT Cruiser because he saw the officer approaching from behind at a high rate of speed, Officer Chavez did not explain to Diaz-Gomez that the stop was based on the earlier observation. Diaz-Gomez testified that he did not remember a PT Cruiser-type vehicle traveling in front of him before Officer Chavez turned around. Tr. 105:2-5.

The United States counters that Officer Chavez's testimony is consistent with his actions. He observed the violation, turned around, caught up to the truck at a high rate of speed, engaged his emergency lights, and pulled the truck over in a safe manner.

After considering Diaz-Gomez's arguments and reviewing the record, including Officer Chavez's and Diaz-Gomez's testimony, the Court finds that Diaz-Gomez has failed to negate Officer Chavez's testimony that he observed the violation before he turned around and before the video equipment was engaged.  Officer Chavez credibly testified that he observed Diaz-Gomez and the vehicle in front of him driving 75 mph with approximately two to three car lengths between the vehicles.  Based on the evidence, the Court concludes that Officer Chavez had sufficient reasonable suspicion that Diaz-Gomez had violated NMSA § 66-7-318(A), and the stop was justified.  However, even if Officer Chavez mistakenly concluded that Diaz-Gomez was following too closely, Officer Chavez had an "objectively reasonable" good faith belief that Diaz-Gomez violated NMSA § 66-7-318(A).  *Vercher*, 358 F.3d at 1261. Hence, the Court concludes that the stop was justified.

B. *Did Officer Chavez "Cause" The Traffic Violation?*

Diaz-Gomez argues that Officer Chavez caused him to follow the PT Cruiser too closely. Video 1 reflects that as soon as Officer Chavez told Diaz-Gomez that he pulled him over for following too closely, Diaz-Gomez explained that he pulled over into the right lane close behind the other vehicle to let Officer Chavez pass. Officer Chavez did not respond to Diaz-Gomez or correct his apparent misconception. Diaz-Gomez's argument is not persuasive, however, because Officer Chavez credibly testified that he stopped Diaz-Gomez based on his previous observation of Diaz-Gomez's position behind the other vehicle as the officer passed the vehicles going the opposite direction on Interstate 40.  Officer Chavez, therefore, did not cause or contribute to the actual infraction that led to the stop, and the stop was justified at its inception.

II. *Were Diaz-Gomez and Quiroga-Gomez Unlawfully Detained Before Officer Chavez Issued the Citations?*

Even if the initial stop of defendant's vehicle was justified, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 22-24. A traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the citation process. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). However, during the time that it takes to issue a citation and to check a driver's license and registration, an officer may ask questions about matters both related and unrelated to the purpose of the stop, as long as those questions do not prolong the length of the detention. *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).  Once the citation process is complete, the officer generally must allow a driver to proceed without further delay.  *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007).  Further detention is permitted only if the

16

officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or the detention has become a consensual encounter. *Id.*

      A.  *Detention of Diaz-Gomez*

Diaz-Gomez argues that Officer Chavez unreasonably prolonged his detention by engaging in two activities before Officer Chavez handed him the citations. First, Officer Chavez, with citations in hand, walked back to the truck, checked the VIN on the dashboard, then opened the driver's door and checked the VIN on the door jamb.  Second, Officer Chavez leaned inside the open driver's door and briefly questioned Mendes-Escareno about his ownership of the truck and travel plans. Officer Chavez then returned to Diaz-Gomez without having made any further notations on the citations, and he then handed Diaz-Gomez the citations and told him he was good to go.  Although these activities lasted less than a minute, Diaz-Gomez claims that the activities unreasonably prolonged his detention because they occurred after Officer Chavez had completed filling out the citations.  Diaz-Gomez maintains that once the legitimate reason for the detention was fulfilled, even that short length of additional detention must be supported by reasonable suspicion or consent.

The United States counters that the Tenth Circuit has consistently held that questioning a driver and passenger about travel plans and vehicle ownership is within the scope of a routine traffic stop. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006). Alternatively, the United States argues that even if the additional questioning and VIN check were beyond the scope of the  traffic stop, they are nonetheless harmless because they did not appreciably prolong the length of the stop. *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007).

Diaz-Gomez cites *United States v. Caro*, 248 F.3d 1240, 1245 (10th Cir. 2000) and *United*

*States v. Lopez-Gutierrez*, 334 Fed. App'x 880 (10th Cir. 2009) (unpublished) to support his

argument. In *Caro*, an officer stopped a vehicle driver, filled out traffic citations, and ran a

license and registration check.  Because the vehicle's registration indicated that the vehicle was

originally a different color, the driver seemed a bit nervous, and the driver could not recall the

registered owner's last name, the officer approached the vehicle after finishing the citations.  The

officer checked the dashboard VIN, and the officer asked the driver to step out of the vehicle so

he could enter the passenger compartment to check the VIN on the door jamb.  The Tenth Circuit

held that when the officer entered the vehicle to verify the VIN, he exceeded the permissible

scope of the detention and violated the driver's Fourth Amendment rights. In *United States v.*

*Chavira*, the Tenth Circuit explained that the holding in *Caro* only prohibits an officer from

entering a vehicle to examine a VIN when the officer has neither consent nor reasonable

suspicion that the vehicle was stolen. 467 F.3d 1286, 1289 n. 1 (10th Cir. 2006). "There is no

unlawful detention under *Caro* if the officer remains physically outside the car when he

examines the VIN on the dashboard, the doorjamb, or both." *Id.* at 1289 n. 1.

     In *Lopez-Gutierrez*, an officer stopped a vehicle for tailgating and an improper lane

change. The officer asked the driver to sit with him inside his patrol unit while the officer filled

out the warning citation.  Prior to issuing the warning, the officer asked the driver if there was

anything illegal in the vehicle and then asked the driver for consent to search the vehicle, which

the driver refused. The officer then deployed his canine around the exterior of the vehicle, and

the dog alerted to the presence of contraband. The Tenth Circuit affirmed the district court's

denial of the suppression motion but held that once an officer finished filling out the citation, the

officer's refusal to give the defendant the citation meant that defendant was not free to terminate

that encounter, and was still being detained beyond the original purpose of the stop, which

18

required reasonable suspicion or consent.  The Tenth Circuit concluded that the officer had reasonable suspicion to detain the driver based on several suspicious circumstances observed by the officer.

Diaz-Gomez relies on *Lopez-Gutierrez* to support his assertion that Officer Chavez impermissibly prolonged the detention because he held onto the citations during the VIN check and brief questioning of Mendes-Escareno.  Diaz-Gomez also argues that even though Officer Chavez did not enter the truck to check the door jamb VIN, this case is distinguishable from *Chavira* because the officer in *Chavira* checked the dash and door VINs comparing them to the registration information before the officer finished filling out the traffic citation.  Officer Chavez had finished writing the citations before he prolonged the stop by examining the VINs and questioning Mendes-Escareno.

The record in this case, however, does not support Diaz-Gomez's assertion that the purpose of the stop was complete when Officer Chavez returned to the truck to check the VINs. Video 1 reveals that Officer Chavez, citations in hand, returned to the truck to check the dashboard VIN, he then glances at the citations, and finally he checks the door jamb VIN.  After briefly questioning Mendes-Escareno about travel plans, Officer Chavez returned to Diaz-Gomez and handed him the citations without having made any written additions or changes to the citations. Diaz-Gomez asks the Court to find that Officer Chavez was finished with the reason for the stop before he returned to the truck to check the VINs, but there is insufficient evidence to support such a finding other than Officer Chavez's failure to add any written information to the citations after the VIN check.  Video 1 shows that Officer Chavez glanced at the citations in his hand after observing the dashboard VIN, which implies that he was verifying the VIN with the VIN that he had written on the citation.  Moreover, Officer Chavez did not

19

enter the truck to verify the door jamb VIN, which was prohibited in *Caro*.  Thus, the Court concludes that the VIN check and brief additional questioning of Mendes-Escareno did not unreasonably prolong the stop beyond its initial purpose, and the detention did not become unlawful as a result.

In addition, the Court cannot apply Diaz-Gomez's restrictive interpretation of Tenth Circuit law.  In *Valenzuela*, the Tenth Circuit stressed that courts should not "focus on the order of events," but on "the reasonableness of the traffic stop in light of both the length of the detention and the manner in which it was carried out. . ." *United States v. Valenzuela*,  494 F.3d at 890. Tenth Circuit law clearly allows an officer to ask questions of both the driver and any passengers as part of a routine traffic stop. *See United States v. Jackson*, 235 Fed. App'x. 707, 710 (10th Cir. 2007) ("Our precedent explicitly and repeatedly affirms the right of an officer to question both the driver and her passenger as part of a routine traffic stop."). Hence, the brief check of the VINs and questioning of Mendes-Escareno before Officer Chavez returned to Diaz-Gomez and handed him the citations did not unreasonably prolong this stop, which had  lasted no more than 17 minutes from the time the truck was stopped until the time Officer Chavez handed Diaz-Gomez the citations and told him that he was free to go.

However, even if Officer Chavez's actions impermissibly prolonged Diaz-Gomez's detention, Diaz-Gomez has failed to demonstrate a nexus between the inspection of the VINs and the additional questioning of Mendes-Escareno to the evidence he seeks to suppress. *See Chavira,* 467 F.3d at 1292 ("There is no indication that the trooper would not have requested or obtained consent to search the truck but for the inspection of the VIN on the doorjamb. We may not suppress evidence without but-for causation."); *United States v. Nava-Ramirez,* 210 F.3d 1128, 1131 (10th Cir. 2000) (stating that to establish a factual nexus the defendant must show that

20

the evidence "would not have come to light but for the government's unconstitutional

conduct."). Evidence will not be suppressed as fruit of the poisonous tree unless an unlawful

search or seizure is at least the but-for cause of its discovery. *Chavira* 467 F.3d at 1292. Thus,

even if Diaz-Gomez's detention was unreasonably prolonged, Diaz-Gomez has failed to show

how the approximately one minute time period in which Officer Chavez inspected the doorjamb

VIN and asked Mendes-Escareno about travel plans provided information to Officer Chavez that

caused Officer Chavez to ask for consent to ask additional questions about the presence of

contraband and to search the truck. Consequently, Diaz-Gomez was not unlawfully detained

during this very short time period.

### B. *Detention of Quiroga-Gomez*

Quiroga-Gomez argues that from the time that Officer Chavez handed the citations to

Diaz-Gomez at 9:59:30 a.m. until the time Quiroga-Gomez was handcuffed at 10:30:00 a.m., he

was unlawfully detained. Quiroga-Gomez contends that at 9:59:30 a.m. when Diaz-Gomez was

told he was "good to go" and began to walk back to the truck, the purpose of the traffic stop was

completed. When Officer Chavez called out to Diaz-Gomez and asked him if he could answer

some more questions, the consensual encounter began. However, Quiroga-Gomez claims that the

consensual encounter was ineffective as to him because he could not hear the exchange outside

of the truck in which he was sitting. Quiroga-Gomez argues that his detention never evolved

into a consensual encounter. Quiroga-Gomez compares his situation to the one in *United States*

*v. Guererro-Espinosa*, 462 F.3d at 1303-04.

In *Guerrero-Espinosa*, a state trooper stopped a minivan for speeding, and the trooper

asked the driver to join him in the trooper's patrol car, while the passenger, Guerrero-Espinosa,

remained in the minivan. After returning the driver's license, the trooper issued him a warning

21

citation, and opened the patrol car so the driver could return to the minivan. When the driver

reached the back of the minivan, the trooper asked and received permission to continue

questioning him, while standing at the back of the minivan. A few minutes later, the trooper

questioned Guerrero-Espinosa, who was still in the minivan about travel plans and the presence

of drugs in the minivan. The Tenth Circuit held that because "the trooper completed the traffic

stop outside Guerrero[-Espinosa]'s presence and because the released driver never returned to

the minivan, a reasonable person in Guerrero[-Espinosa]'s position would not have realized the

traffic stop had ended and he was free to leave." *Id.* at 1304.  Therefore, "as far as Guerrero[-

Espinosa] was concerned, the traffic stop did not evolve into a consensual encounter." *Id.*

The United States concedes that Quiroga-Gomez was not privy to the conversation

between Officer Chavez and Diaz-Gomez in which the officer informed Diaz-Gomez that he was

"good to go."  Two minutes later, however, Officer Chavez returned to the truck, gave back

Mendes-Escareno his documents, and told both Quiroga-Gomez and Mendes-Escareno that they

were "good to go," before he asked for and received verbal consent to further questioning. The

United States argues that when Officer Chavez told both passengers that they were "good to go,"

he properly received verbal consent to further questioning, and the encounter with Quiroga-

Gomez became consensual. Quiroga-Gomez counters that he could not have reasonably felt free

to go when Officer Chavez said to both occupants that they were "good to go" because he

understands and speaks only Spanish and could not have knowingly and voluntarily consented at

that point. Video 1 at 10:02:57 a.m.

Video 1 reveals that only a few minutes later, at 10:05:02 a.m., Officer Chavez asked

Quiroga-Gomez in English where he was traveling, and Quiroga-Gomez answered

"Minneapolis" in English. Quiroga-Gomez demonstrated that he understood and spoke some

English.  Quiroga-Gomez did not testify at the suppression hearing; therefore, there is no direct testimony that Quiroga-Gomez did not understand what Officer Chavez meant when he told Quiroga-Gomez and Mendes-Escareno that they were "good to go."  Moreover, when Diaz-Gomez began to walk back to the truck after receiving the citations, Mendes-Escareno stood up and prepared to drive, signaling to Quiroga-Gomez that the group would be continuing their journey.  From this evidence, the Court cannot conclude that Quiroga-Gomez's continued detention was unlawful because it was not consensual. *See United States v. Luna-Gonzales*, 90 Fed. App'x 366, 369 (10th Cir. 2004) (unpublished) (concluding that defendant had sufficient knowledge of English to consent to further questioning because defendant told officer in English where he was traveling).

Even if the Court concludes that Quiroga-Gomez's detention was unlawful, however, Quiroga-Gomez must show that his unlawful detention led to the discovery of the methamphetamine that he seeks to suppress.  The United States correctly asserts that Quiroga-Gomez has failed to establish a nexus between his allegedly unlawful detention and the challenged evidence. *See supra Nava-Ramirez*, 210 F.3d at 1131 (stating that it is the defendant's burden to demonstrate a factual nexus between the illegality and the challenged evidence.). Therefore, Quiroga-Gomez is not entitled to suppression of the evidence as fruit of his detention.

III. *After Issuing the Citations, Did Officer Chavez Have Consent To Further Questioning?*

After a routine traffic stop, an officer may not detain a driver and his passengers unless the officer has reasonable suspicion of other offenses or the driver and passengers voluntarily consent to further questioning. *United States v. Sandoval*, 29 F.3d 537, 539-40 (10th Cir.1994).

"A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999). A "seizure," by contrast, occurs when an individual "has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way." *Id.* "A detention for a traffic citation can turn into a consensual encounter after the [officer] has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. Wallace*, 429 F.3d 969, 974-75 (10th Cir.2005) (citation omitted). An encounter does not become consensual if an officer displays conduct that would have conveyed to a reasonable person that he was not free to decline the officer's requests or otherwise terminate the encounter. *United States v. Guerrero-Espinoza*, 462 F.3d at 1308.

The government bears the burden of proving voluntary consent based on the totality of the circumstances. *Id.* The Tenth Circuit has determined that a finding of voluntary consent requires the following: 1) there must be a clear and positive testimony that consent was unequivocal and specific and freely given; and 2) the government must prove consent was given without duress or coercion, express or implied. *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Some of the factors that courts consider in assessing voluntary consent include the age of the consenting individual, his education, his intelligence, the lack of advice about constitutional rights to the consenting individual, the nature and duration of the questioning, and the individual's knowledge of his right to refuse. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). However, the standard for determining whether a person's consent was voluntary is an objective standard and the Court may not rely on evidence of a person's subjective belief that he was not free to refuse consent. *United States v. Hernandez*, 93 F.3d 1493, 1498-99 (10th Cir.

24

1996) (reversing grant of motion to suppress because district court relied on defendant's

subjective belief rather than officer's undisputed statement that he told defendant he was free to

go). Thus, the Court must determine whether a reasonable person under the circumstances would

have felt free to terminate the encounter.

### A. *Further Questioning of Diaz-Gomez*

Diaz-Gomez argues that his detention was non-consensual during the ten minute time

period after Officer Chavez gave the citations to him and the time that Diaz-Gomez signed the

consent form. At 9:59:30 a.m., Officer Chavez handed Diaz-Gomez the citations and his

paperwork and told him he was "good to go." As Diaz-Gomez walked back toward the truck,

Officer Chavez called out to him and asked if Officer Chavez could ask him some more

questions. Upon hearing Officer Chavez call to him, Diaz-Gomez immediately turned around

and returned to the patrol vehicle.

Diaz-Gomez first argues that his consent to further questioning was insufficient to purge

the taint of the unreasonable detention.[7] Since the Court has determined that Diaz-Gomez's

detention up to that point was reasonable, the United States need not carry the greater burden to

show that the consent was "an act of free will to purge the primary taint of the illegal

[detention]." *United States v. McSwain*, 29 F.3d 558, 562 (10th Cir. 1994) (citation omitted).

Alternatively, Diaz-Gomez argues that even under the standard burden of proof, the

---

[7] "A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances." *United States v. McSwain*, 29 F.3d 558, 562 (10th Cir. 1994) (citation omitted). "The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal [detention]." *Id.* (citation omitted). The government must demonstrate that the consent to search is "sufficiently an act of free will to purge the primary taint of the illegal [detention]." *Id.* (citation omitted).

United States cannot demonstrate that he voluntarily agreed to further questioning. According to Diaz-Gomez, a reasonable person in Diaz-Gomez's shoes, in his early twenties with little experience with law enforcement officers, would not have felt free to refuse to answer further questions. Diaz-Gomez points to his immediate reaction to Officer Chavez's request as evidence that he did not feel free to leave and relies on *United States v. Pina-Aboite*, 109 Fed. App'x 227 (10th Cir. 2004) (unpublished) for support. [8]

In *Pina-Aboite* the officer pulled the defendant's vehicle over for an expired license tag, but upon further examination, the officer discovered that he was mistaken. Instead of releasing the driver and passenger, the officer unlawfully detained them to check license, registration and insurance documents. After the officer returned the driver's paper work and as the driver turned around to return to his vehicle, the officer immediately called out in Spanish "¿Sabes que?" or "You know what?" and the officer said "Um, this car[?]" [and] Mr. Pina-Aboite turned and walked back to Officer Ramos, . . ." *Id.* at 230.  The court held that the driver's quick turn around in response to the officer's cryptic statement supported the finding that his consent did not purge the taint of the prior unlawful detention. *Id.* at 238.

This case, however, is distinguishable from *Pino-Aboite* because Diaz-Gomez's consent was not on the heels of an unlawful detention. After Officer Chavez told Diaz-Gomez he was "good to go," unlike the officer in *Pina-Aboite*, Officer Chavez waited a few seconds until Diaz-Gomez had walked back to the truck before calling out to him. Also in this case, Officer Chavez clearly stated that Diaz-Gomez was "good to go," unlike the other cases upon which Diaz-

---

[8] There is no evidence of record that Diaz-Gomez had little experience with law enforcement officers. Even though Diaz-Gomez is a young man in his early twenties, the Court cannot assume in the absence of evidence that he has had little experience with police.

Gomez relies. *See, e.g. United States v. Sandoval*, 29 F.3d 537, 541 (10th Cir. 1994) (finding consent was not voluntary because while both the officer and driver were in patrol unit, officer gave driver back his documents and then in response to the driver's statement "that's it?" the officer said "no, wait a minute" and then questioned the driver); and *United States v. Mota*, 864 F. Supp. 1123, 1127-28 (D. Wyo. 1994) (finding that further questioning was non-consensual when officer returned all documents but continued to lean on the defendant's car while asking questions without pausing).

In his supplemental briefing, Diaz-Gomez argues that Officer Chavez's actions during questioning created a coercive atmosphere that should lead the Court to find that Diaz-Gomez's consent to further questioning was not voluntary. Diaz-Gomez argues that he reasonably concluded that he had to answer the questions because Officer Chavez used his clip board and wrote down notes after each of his answers.  Also, Officer Chavez asked very detailed questions about Diaz-Gomez's relationship with the passengers and their high school mascot, which Diaz-Gomez contends a reasonable person would interpret as an attempt to trip him up. Officer Chavez then told Diaz-Gomez to remain at the patrol unit, and Officer Chavez returned to the truck to question the passengers. Four minutes later, Officer Chavez walked back to Diaz-Gomez and questioned Diaz-Gomez about the presence of drugs or other contraband in the truck. Believing that Diaz-Gomez had received a call, Officer Chavez ordered Diaz-Gomez to hangup his cell phone. Officer Chavez then directed Diaz-Gomez to stand by the fence and placed Diaz-Gomez's cell phone in the truck. While answering questions, Diaz-Gomez wore sandals and no coat in cold December weather. Diaz-Gomez cites two cases in support of his argument that all of Officer Chavez's actions were displays of authority that created a coercive atmosphere that would lead a reasonable person to believe that he was not free to leave; thus Diaz-Gomez was

unreasonably detained during the additional questioning.

Diaz-Gomez cites *United States v. Hernandez*, a case in which the district court granted a motion to suppress.  The district court found that Hernandez was unlawfully detained when after issuance of a traffic citation, the officer asked him if he could ask him more questions while both the officer and Hernandez sat in the patrol car. 93 F.3d at 1499. The Tenth Circuit Court of Appeals reversed the ruling because the district court had relied on Hernandez's subjective belief that he was not free to leave. *Id.*  The evidence showed that the officer had returned all of Hernandez's documents, had told him he was free to go, and Hernandez had turned to open the car door when the officer inquired if he could ask some more questions.  *Id.* The Court of Appeals stressed that only one officer was present at the scene, and that the officer did not use a commanding or intimidating tone of voice while the officer asked several questions about Hernandez's travel plans, luggage, and relationship with his traveling companion before turning to questions about contraband. *Id.* The Court of Appeals stated that the type of questions asked was not as important as the manner that those questions were asked: "'accusatory, persistent, and intrusive' questioning may turn an otherwise voluntary encounter into a coercive one if it conveys the message that compliance is required." *Id.* (citation omitted).

Similarly, in this case, Officer Chavez was the only officer on the scene, and he did not use a commanding tone of voice or accusatory manner of questioning.  Thus, Diaz-Gomez's voluntary consent to further questioning was not converted into an unreasonable detention.

Diaz-Gomez also cites *United States v. Guererro-Espinosa*, and argues that Officer Chavez negated Diaz-Gomez's previous consent to questioning when Officer Chavez told Diaz-Gomez to remain at the patrol unit while Officer Chavez returned to the truck to question Quiroga-Gomez and Mendes-Escareno. In *Guererro-Espinosa*, the court concluded that

28

additional questioning of a passenger was nonconsensual because the passenger was unaware

that the driver, who was receiving a traffic citation outside of the vehicle, had received all of his

documents and had been told he was free to leave. 462 F.3d at 1308.   However, Diaz-Gomez

was not in the same position as the passenger in *Guerrero-Espinosa*. Diaz-Gomez was told he

was free to leave after he received his documentation and citations. Thus, the subsequent

questioning of Quiroga-Gomez and Mendes-Escareno, that Diaz-Gomez admits lasted only

about four minutes, did not negate Diaz-Gomez's consent to further questioning. As pointed out

by the United States, Diaz-Gomez's testimony also belies his argument that he was coerced into

consenting to further questioning. Diaz-Gomez admitted on cross examination that during

questioning, he felt coerced only by the fact that Officer Chavez was a police officer,

> Q. In fact, the only reason that you testify that you felt you
> couldn't go is because he's a police officer, correct ?
> A. Yes.
> Q. But he didn't make any show of authority or any suggestion
> to you that in fact you were required to stay.
> A. Just him being an officer.
> Q. So it's your belief that any time an officer asks if they
> can ask you a question, you are not permitted to say no.
> A. Yes.

Tr. 115:20-116:3.

Under Tenth Circuit case law, more overt displays of authority, such as the presence of

more than one officer, the use of a commanding tone of voice, display of an officer's weapon, or

physical touching, are required to negate consent. *See United States v. Bradford*, 423 F.3d 1149,

1159 (10th Cir. 2005). In this case as in *Hernandez*, "there was no evidence of physical

mistreatment, violence, threats, promises or inducements, deception or trickery, display of a

weapon, use of a commanding manner of tone of voice, or the presence of more than one officer.

*Hernandez*, 93 F.3d at 1500.  The, the Court concludes that Officer Chavez's further questioning

of Diaz-Gomez after he received the citations was consensual and remained consensual even

after Officer Chavez returned to the truck to briefly question Diaz-Gomez's  traveling

companions.

    IV.  _Diaz-Gomez's Written Consent to Search The Truck_

       Diaz-Gomez next argues that even though he read and signed the written consent form,

he did not voluntarily consent to a search of the vehicle.  Diaz-Gomez argues the search of the

truck was preceded by an unlawful detention; however, the Court has determined that the

detention was lawful.  Nevertheless, the United States must show that Diaz-Gomez's written

consent to search the truck was voluntary.  The United States must show there was no duress or

coercion, express or implied, that the consent was unequivocal and specific, and that it was

freely and intelligently given. _Hernandez_, 93 F.3d at 1500.

       At 10:06:34 a.m., Officer Chavez asked Diaz-Gomez questions about whether the truck

contained weapons or contraband.  Officer Chavez then asked Diaz-Gomez whether he was

responsible for everything in the vehicle. Diaz-Gomez answered that he was responsible only for

himself and his bag.  At 10:07:27 a.m., Officer Chavez then asked if he could search the vehicle,

and Diaz-Gomez answered "no."  For a reason not revealed in the record, Officer Chavez

ignored or misunderstood Diaz-Gomez's refusal and stated, "Yeah? OK. Hold on. Hold on. I

have a form here. Do you read English of Spanish better?"  Diaz-Gomez answered "both." Video

1 at 10:07:41 a.m. Officer Chavez requested backup in Diaz-Gomez's presence. Video 1 at

10:07:51 a.m. Officer Chavez then refused Diaz-Gomez's offer to show him the map of their

intended journey and asked Diaz-Gomez to hang up his phone. At 10:08:37 a.m., Officer Chavez

stated ". . . I just want to search the vehicle, OK?"  Diaz-Gomez did not verbally respond.

Officer Chavez then handed Diaz-Gomez the consent form, told Diaz-Gomez that the form

allowed Officer Chavez to search the vehicle, and told Diaz-Gomez to read the form and understand it before he signed it.

At 10:09:10 a.m., Diaz-Gomez proceeded to read the form out loud in English. At 10:10:06, Officer Chavez stated to Diaz-Gomez that the form allowed the officer to "search the vehicle," and that Diaz-Gomez did not have to sign the form. After Officer Chavez asked Diaz-Gomez if he read the form in both English and Spanish, Diaz-Gomez then proceeded to read the form out loud in Spanish. Diaz-Gomez then signed the form.

Diaz-Gomez argues that under the totality of these circumstances, the United States has failed to show that he voluntarily consented to the search. Diaz-Gomez maintains that Officer Chavez created a coercive and intimidating atmosphere because Officer Chavez ignored Diaz-Gomez's initial verbal refusal, told Diaz-Gomez to hang up his phone, and called for backup assistance in Diaz-Gomez's presence.

The United States counters that Officer Chavez engaged in no conduct that would have suggested to Diaz-Gomez that he was required to consent to a search of the vehicle. Although the United States fails to address the effect of Diaz-Gomez's verbal refusal, the United States focuses on Officer Chavez's subsequent clear statements that Diaz-Gomez did not have to sign the consent form and that Diaz-Gomez should read the form and understand it before signing it. After Officer Chavez's cautionary instructions, Diaz-Gomez read both the English and Spanish versions of the consent form aloud to himself and then signed it.

The voluntariness of consent must be determined from the totality of the circumstances. *United States v. Nunez-Bustillos*, 2005 W.L. 2704958 at *5 (D. Kan. 2005) (citing *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir.2001)). The Court notes that neither Diaz-Gomez nor the United States assign particular significance to Diaz-Gomez's initial verbal refusal

31

of consent to search the truck. Thus, the Court has analyzed the initial refusal as only one of the totality of the circumstances that the Court must consider in determining the voluntariness of Diaz-Gomez's consent. Diaz-Gomez did not testify about his initial refusal of consent, but it is clearly audible on Video 1. In a similar case, *Zubia-Melendez*, the defendant initially refused the officer's request to search his vehicle, but when immediately asked again, the defendant consented. 263 F.3d at 1163. The Tenth Circuit, acknowledged that the issue was a "close one," but concluded that the initial refusal did not render the defendant's subsequent consent involuntary. *Id.* That case contained arguably more coercive circumstances than this one. For example, the officer had not informed the defendant that he was free to leave or that he could refuse consent, and the officer had not given defendant back his documents. *Id.* Nevertheless, the court upheld the finding that the consent was voluntary noting that the district court found no physical or verbal coercion during the short eleven minute roadside detention. *Id.* In this case, Officer Chavez had returned Diaz-Gomez's documents and had told Diaz-Gomez he was "good to go" before requesting consent to search. *See also, United States v. Thao*, 291 Fed. App'x 129, 132 (10th Cir. 2001) (unpublished) (finding written consent voluntary even though defendant withdrew his initial consent because after withdrawal of consent, defendant reinstated his consent to a search after the officer told defendant that a drug dog had been called). And, although the officer did not heed Diaz-Gomez's answer of "no" when Officer Chavez verbally asked for consent to search the truck and directed Diaz-Gomez to end his phone conversation, the written consent and Officer Chavez's verbal warnings to read and understand the form, and his statement to Diaz-Gomez that he did not have to sign the consent, are sufficient to validate the consent. The evidence shows that Diaz-Gomez did read the form. In fact, he read the form both in English and in Spanish out loud to himself before he signed the form. The form states in

clear language that an individual may refuse to consent to a search. Under the totality of the

circumstances, the Court finds that Diaz-Gomez voluntarily signed the written consent form.

### V. *Did the Canine Search Exceed the Scope of the Consent?*

The scope of a consent to search is limited by the breadth of the consent given. *United*

*States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995). The breadth of a consent is objective and

is defined as what a reasonable person would have believed his consent involved.  *Id.* A canine

search or "sniff" around the exterior of a defendant's car while the defendant is lawfully seized

for a traffic violation is not considered a search under the Fourth Amendment. *See Illinois v.*

*Caballes*, 543 U.S. at 409. And when a canine alerts to the presence of contraband while

performing an exterior search, the officer then has probable cause to search the interior of the

vehicle. *United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir.2004).

In his supplemental brief, Diaz-Gomez argues that the search of the truck was beyond the

scope of his consent because he thought that Officer Chavez wanted to search only his bags,

which were the only property for which Diaz-Gomez thought he was responsible. [9]  After calling

Diaz-Gomez back and receiving verbal consent for further questioning, Officer Chavez asked

Diaz-Gomez if he was responsible for the truck.  Diaz-Gomez answered that he was only

responsible for himself and his bags. Officer Chavez then requested permission to search the

truck, but Diaz-Gomez stepped toward the truck, in an effort to retrieve his bags. Video 2.

Although Diaz-Gomez now argues that his actions demonstrate that he thought Officer Chavez

intended to search only his bags, he did not testify about this belief.  Consequently, the record

does not support Diaz-Gomez's argument that he thought the consent to search was for his bags

---

[9] *See* Defendant Diaz-Gomez's Supplemental Brief In Support Of Motion To Suppress
(Doc. No. 44) at p. 17.

only.  However, even if the Court had evidence that Diaz-Gomez initially understood the search to be directed only at his bags, it does not nullify Diaz-Gomez's written consent to search the truck.  Before Diaz-Gomez got to retrieve his bags, Officer Chavez directed Diaz-Gomez's attention to the consent form. The consent form clearly stated that the truck was the object of the search; therefore, any possible confusion would have been immediately dispelled when Diaz-Gomez read and signed the form.

The consent to search form authorizes "Officer Chavez/K 9 Chica" to search the truck, including any luggage and containers in the truck. United States' Response To Defendants' Motion To Suppress (Doc. No. 53) Ex. 1. Despite this language, Diaz-Gomez further argues that the consent form did not inform him that Chica would be allowed to search the interior of the truck.  The written consent form states,

> I Miguel Diaz-Gomez hereby grant my consent to Arcenio Chavez/K9 Chica officers of the New Mexico Department of Public Safety to search the following vehicle described below including luggage, containers, and contents therein.

*Id.* The vehicle is described by make, color and license plate number.  *Id.* The consent form continues,

> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

*Id.* Diaz-Gomez's signature and the date appear at the bottom of the form.

The United States argues that the wording of the form clearly indicated that Officer Chavez and Canine Chica would be allowed to search the inside of the truck. The Court agrees and finds that by signing the consent form, Diaz-Gomez voluntarily authorized the interior search by Canine Chica.   In addition, when Chica alerted to the presence of contraband while

34

outside of the truck and then jumped into the passenger's side and indicated near the glove compartment, Officer Chavez had probable cause to search the entire truck for drugs or other illegal contraband.  *See Rosborough*, 366 F.3d at 1153 (holding that a canine alert to any area of a vehicle creates general probable cause to search the entire vehicle including the trunk).

### *Conclusion*

Officer Chavez had sufficient reasonable suspicion to believe that Diaz-Gomez was following a vehicle too closely in violation of New Mexico law, therefore, Officer Chavez justifiably stopped the truck Diaz-Gomez was driving. After completing the citations for following too closely and failure to have a driver's license, Officer Chavez did not unlawfully prolong Diaz-Gomez's detention when he checked the VINs on t he truck and questioned Mendes-Escareno, the owner of the truck, about the group's travel plans. Hence, Diaz-Gomez was not unlawfully detained during that brief period.  After receiving all of his documents and the citations, Diaz-Gomez voluntarily returned to Officer Chavez to answer further questions. And, upon reading and signing a consent to search form, Diaz-Gomez voluntarily consented to a search of the truck, including the canine search of both the interior and exterior of the vehicle. Thus, Diaz-Gomez's Motion will be denied.

Quiroga-Gomez was a passenger who had no ownership or possessory interest in the truck. As such, he does not have standing to challenge the search of the truck itself.  However, he does have standing to challenge his detention after the purpose of the stop had been completed. As to Quiroga-Gomez, the evidence will be suppressed only if the evidence was the fruit of Quiroga-Gomez's unlawful detention. After issuing the citations, Officer Chavez asked Quiroga-Gomez and Mendes-Escareno to answer some additional questions, and they voluntarily agreed to further questioning. Thus, on the evidence presented, Quiroga-Gomez voluntarily agreed to

his continued detention.  But, even if Quiroga-Gomez was unlawfully detained because he was did not voluntarily consent to further questioning, he has failed to show that but for his unlawful detention, the evidence would never have been discovered. Therefore, Quiroga-Gomez's motion to suppress will also be denied.

IT IS ORDERED that Miguel Diaz-Gomez's Motion To Suppress (Doc. No. 30) is denied.

IT IS FURTHER ORDERED that Oscar Armando Quiroga-Gomez's Motion to Suppress, which was filed as the Unopposed Notice of Joinder In June 16, 2010 Motion Hearing (Doc. No. 38), is denied.

_____
UNITED STATES SENIOR DISTRICT JUDGE